# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                          No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL Sanchez, a.k.a.
"Dan Dan," GERALD ARCHULETA, a.k.a.
"Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ,
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

     **THIS MATTER** comes before the Court on Defendant Arturo Arnulfo Garcia's oral

motion, under rule 29 of the Federal Rules of Criminal Procedure, to dismiss Count 3 of the

Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment"). According to the Indictment, A. Garcia murdered Freddie Sanchez "for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM)," in violation of the Violent Crimes in Aid of Racketeering Act, 18 U.S.C. § 1959 ("VICAR"). Indictment at 10-11. A. Garcia contends that Plaintiff United States of America's evidence "is insufficient to sustain a conviction," Fed. R. Crim. P. 29, because it does not indicate that the Sanchez murder had anything to do with the SNM's economic activities, e.g., drug trafficking, see Indictment at 4 ("One of the significant goals of the SNM Gang was to control and profit from narcotics trafficking."). A. Garcia does not argue that the United States has failed to meet its burden, under VICAR, to show that the SNM is an enterprise, e.g., a gang, "which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). A. Garcia argues, instead, that VICAR exceeds Congress' authority under the Commerce Clause of the Constitution of the United States of America, see U.S. Const. art. I, § 8, cl. 3, when applied to gang-related violent crimes that are not tied to the gang's commercial activities.

Canonically, the Commerce Clause permits Congress to regulate three categories: "First, Congress can regulate the channels of interstate commerce. Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce. Third, Congress has the power to regulate activities that substantially affect interstate commerce." Gonzales v. Raich, 545 U.S. 1, 16-17 (2005)("Raich")(citations omitted).[1] Notwithstanding that pronouncement and others like it, common sense dictates that

---

[1]Over a decade ago, Justice Scalia wrote a scathing critique of this formulation:

Since Perez v. United States, 402 U.S. 146 (1971), our cases have mechanically recited that the Commerce Clause permits congressional regulation of three

Congress' power under the Commerce Clause cannot extend to every activity that affects interstate commerce. As an illustration, many economists contend that the Second World War ended the Great Depression,[2] but suggesting that the Commerce Clause permits Congress to

---

categories: (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce, and persons or things in interstate commerce; and (3) activities that "substantially affect" interstate commerce. Id. at 150. The first two categories are self-evident, since they are the ingredients of interstate commerce itself. The third category, however, is different in kind, and its recitation without explanation is misleading and incomplete.

It is *misleading* because, unlike the channels, instrumentalities, and agents of interstate commerce, activities that substantially affect interstate commerce are not themselves part of interstate commerce, and thus the power to regulate them cannot come from the Commerce Clause alone. Rather, as this Court has acknowledged since at least United States v. Coombs, 37 U.S. (12 Pet.) 72 (1838), Congress's regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities that have a substantial effect on interstate commerce) derives from the Necessary and Proper Clause. And the category of "activities that substantially affect interstate commerce," is *incomplete* because the authority to enact laws necessary and proper for the regulation of interstate commerce is not limited to laws governing intrastate activities that substantially affect interstate commerce. Where necessary to make a regulation of interstate commerce effective, Congress may regulate even those intrastate activities that do not themselves substantially affect interstate commerce.

Raich, 545 U.S. at 33-35 (Scalia, J., concurring in judgment)(footnote and citations omitted)(emphasis in the original).

[2]"What ended the Great Depression? In the traditional view, the answer is World War II, a conclusion that appears in the works of numerous economists and historians." J.R. Vernon, World War II Fiscal Policies and the End of the Great Depression, 54 J. ECON. HIST. 850, 850 (1994). That traditional view is not universally accepted, however:

The conventional wisdom is that the U.S. economy remained depressed for all of the 1930s and only returned to full employment following the outbreak of World War II[, but] declines in real output in the early 1930s, and again in 1938, were so large that it took many years of unprecedented growth to undo them and return real output to normal levels.

. . . . Between 1929 and 1933, real GNP declined 35 percent; between 1933 and 1937, it rose 33 percent. In 1938 the economy suffered another 5 percent decrease in real GNP, but this was followed by an even more spectacular increase of 49

stimulate the national economy by sending millions of Americans to fight Nazis would be laughable.

The Supreme Court of the United States of America's latest Commerce Clause decision, see Nat'l Federation of Independent Business v. Sebelius, 567 U.S. 519 (2012)("Sebelius"), confirms that common-sense insight. Five Supreme Court Justices concluded that the individual mandate in the Affordable Care Act, Pub. L. No. 111-148, 123 Stat. 119 (2010) -- which requires individuals to obtain health insurance or else to pay a penalty to the Internal Revenue Service -- cannot be justified on Commerce Clause grounds, even though the individual mandate has immense effects on interstate commerce. See Sebelius, 567 U.S. at 558, 561 (opinion of Roberts, C.J.); id. at 649-57 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.). Sebelius thus reveals that a valid exercise of Congress' Commerce Clause power requires more than a substantial effect on interstate commerce. See Sebelius, 567 U.S. at 558, 561 (opinion of Roberts, C.J.); id. at 649-57 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.).

The Court's survey of Supreme Court precedent indicates, instead, that three requirements apply when Congress seeks to exercise its power "to regulate commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. Congress must: (i) regulate; (ii) commerce;[3]

---

percent between 1938 and 1942. By almost any standard, the growth of real GNP in the four-year periods before and after 1938 was spectacular.

Christina D. Romer, What Ended the Great Depression?, 52 J. ECON. HIST. 757, 759-60 (1992); id. at 758 ("'[I]t is hard to attribute any of the pre-1942 catch-up of the economy to the war.'") (quoting J. Bradford de Long, Lawrence H. Summers et al., How Does Macroeconomic Policy Affect Output?, 1988 BROOKINGS PAPERS ON ECONOMIC ACTIVITY 433, 467).

[3]"[T]hus far in our nation's history, our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." United States v. Morrison, 529 U.S. 598, 613 (2000)(Rehnquist, C.J.). Congress can reach noneconomic activity that affects interstate commerce, if at all, by supplementing its power to regulate interstate commerce

(iii) that possesses significant interstate effects.  The Court addresses each requirement in turn.

First, according to Chief Justice John Marshall, the "power to regulate" an activity is the power "to prescribe the rule by which" the activity "is to be governed."  <u>Gibbons v. Ogden</u>, 22 U.S. (9 Wheat) 1, 196 (1924)(Marshall, C.J.).  Under that broad definition, many laws qualify as regulations, including laws: (i) prohibiting shipment of goods made under certain labor conditions, <u>see</u> <u>United States v. Darby</u>, 312 U.S. 100, 113 (1941); (ii) imposing production limitations, <u>see</u> <u>Wickard v. Filburn</u>, 317 U.S. 111 (1942); (iii) affirmatively authorizing navigation and trade, <u>see</u> <u>Gibbons v. Ogden</u>, 22 U.S. (9 Wheat) at 212-13; (iv) proscribing racial discrimination in particular industries, <u>see</u> <u>Heart of Atlanta Motel, Inc. v. United States</u>, 379 U.S. 241, 258, 261 (1964)(hotels); <u>Katzenbach v. McClung</u>, 379 U.S. 294, 304-05 (1964)(restaurants); and (v) prohibiting extortionate lending practices, <u>Perez v. United States</u>, 402 U.S. 146, 156-57 (1971).  The only restriction that the Supreme Court has articulated regarding congressional actions that qualify as regulations is that regulating an activity does not encompass requiring people to engage in that activity.  <u>See</u> <u>Sebelius</u>, 567 U.S. at 550 (opinion of Roberts, C.J.)("The power to *regulate* commerce presupposes the existence of commercial activity to be regulated." (emphasis in original)); <u>id.</u> at 649 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.)("[O]ne does not regulate commerce that does not exist by compelling its existence.").  While the Supreme Court's capacious understanding of regulation means that almost any congressional action qualifies, Congress must still satisfy the Commerce Clause's less-than-demanding regulation requirement.  <u>See</u> <u>Sebelius</u>, 567 U.S. at 550 (opinion of Roberts, C.J.)("The Framers gave Congress the power to *regulate* commerce, not to *compel* it . . . ."

with its Necessary and Proper Clause power "[t]o make all laws which shall be necessary and proper for carrying" other powers "into execution."  U.S. Const. art. I, § 8, cl. 18.  <u>See</u> <u>infra</u> (describing the scope of Congress' power under the Necessary and Proper Clause).

(emphasis in original)); id. at 690 (joint opinion of Scalia, Kennedy, Thomas, Alito, JJ.)(denying that "failure to enter the health insurance market . . . is an *activity* that Congress can 'regulate'" (emphasis in original)).

Second, again according to Chief Justice Marshall, "commerce" refers to more than just "traffic, to buying and selling, or the interchange of commodities." Gibbons v. Ogden, 22 U.S. at 189-90. Commerce, instead, means "intercourse[,] . . . the commercial intercourse between nations, and parts of nations, in all its branches," so commerce comprehends both "navigation" and "the admission of vessels of one nation into the ports of the other." Gibbons v. Ogden, 22 U.S. at 189-90. More recently, the Supreme Court defined "'[e]conomics'" as "'the production, distribution, and consumption of commodities.'" Raich, 545 U.S. at 25 (quoting Webster's Third New International Dictionary 720 (1966)). Importantly, the Supreme Court has discarded the antiquated notion that production is not commerce. Compare Raich, 545 U.S. at 26 (concluded that the Controlled Substances Act is a permissible exercise of Congress' Commerce Clause power, because it "regulates quintessentially economic activities: the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market"), with Hammer v. Dagenhart, 247 U.S. 251, 272 (1918)("The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped, or used in interstate commerce, make their production a part thereof."). Commerce thus includes: (i) coal mining; (ii) lending money; (iii) restaurant operation; (iv) providing hospitality; and (v) growing wheat for personal use. See United States v. Lopez, 514 U.S. 549, 559-60 (1995)(citing Hodel v. Va. Surface Mining & Reclamation Ass'n, 542 U.S. 264 (1981); Perez v. United States; Katzenbach v. McClung; Heart of Atlanta Motel, Inc. v. United States; and Wickard v. Filburn).

Recent years have supplemented that litany with counterexamples, i.e., activities that are not commerce: (i) "mere gun possession," United States v. Lopez, 514 U.S. at 585 (Thomas, J., concurring); see id. at 562 (Rehnquist, C.J.)(faulting a federal statute for lacking an "express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with" commerce); (ii) "[g]ender-motivated crimes of violence," United States v. Morrison, 529 U.S. 598, 613 (2000)(Rehnquist, C.J.)(declaring that such crimes "are not, in any sense of the phrase, economic activity"); (iii) simple possession -- as opposed to possession with intent to distribute -- of drugs, see Raich, 545 U.S. at 40 (Scalia, J., concurring in judgment); and (iv) "the failure to enter the health insurance market," Sebelius, 567 U.S. at 660 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.); see id. at 550-51 (opinion of Roberts, C.J.). While commerce -- like regulation -- takes myriad forms, the Supreme Court has been clear that Congress must satisfy the commerce requirement to validly exercise its power under the Commerce Clause. See Sebelius, 567 U.S. at 557 (opinion of Roberts, C.J.)("We have said that Congress can anticipate the *effects* on commerce of an economic activity. But we have never permitted Congress to anticipate that activity itself in order to regulate individuals not currently engaged in commerce." (emphasis in original)(citations omitted)); id. ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions."); id. at 648 (joint opinion of Scalia, Kennedy, Thomas, Alito)("[T]o say the *failure* to grow wheat (which is *not* an economic activity, or any activity at all) nonetheless affects commerce and therefore can be federally regulated, is to make mere breathing in and out the basis for federal prescription and to extend federal power to virtually all human activity." (emphasis in original)). See also United States v. Morrison, 529 U.S. at 617 ("We accordingly

reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce."); United States v. Lopez, 514 U.S. at 560 (Rehnquist, C.J.)("Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.").

Third, yet again according to Chief Justice Marshall, Congress cannot use the Commerce Clause to authorize commercial regulation regarding "the exclusively internal commerce of a State." Gibbons v. Ogden, 22 U.S. (9 Wheat) at 195. "The completely internal commerce of a State" encompasses only commerce that is "carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States." Gibbons v. Ogden, 22 U.S. (9 Wheat) at 194-95. In our modern, interconnected world, it is difficult to imagine activity that both qualifies as commerce and that does not affect "more States than one." Gibbons v. Ogden, 22 U.S. (9 Wheat) at 194.[4] Further, whether commerce produces interstate effects is a factual issue -- and not a legal issue -- and the Supreme Court is willing to defer to Congress' judgment on that issue as long as that judgment is rational. See Raich, 545 U.S. at 22 ("We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding."); Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. at 276 ("The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding.").

_____

[4]It is still possible, however, to conjure up scenarios, albeit unlikely ones, where commercial activity does not affect more than one state. Imagine, for example, a scenario where a small group of people becomes stranded in a remote location -- Alaska, perhaps -- with no realistic possibility of rescue or escape. Barter transactions within that group would qualify as purely intrastate commerce.

Notwithstanding those three limits, Congress can enact sweeping legislation regulating interstate commerce that also applies to some noncommercial and intrastate activity as long as the legislation's overbreadth is "necessary and proper for carrying into execution" Congress' Commerce Clause power.  U.S. Const. art. I, § 8, cl. 18.  See M'Culloch v. Maryland, 17 U.S. (4 Wheat) 316, 421 (1819)(Marshall, C.J.)("Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.").  For example, in the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, Congress decided to regulate the interstate firearms market by excluding felons from it.  See 92 Stat. at 231, § 922(f)(prohibiting any person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year . . . to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce"); id. at 236, § 1202(a)(declaring that a felon "who receives, possesses or transports in commerce or affecting commerce . . . any firearm" commits a criminal offense). The Commerce Clause -- taken alone -- permits Congress to regulate the interstate firearms market, but it does not permit Congress to regulate firearm possession, because possession is not commerce.  See Lopez v. United States, (holding that legislation regulating firearm possession in school zones exceeded Congress' Commerce Clause power); id. at 551 (commenting that "[t]he Act" does not "regulate[] a commercial activity").  See also United States v. Morrison, 529 U.S. at 610 ("[A] fair reading of Lopez shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case."); United States v. Dorris, 236 F.3d 582, 585 (10th Cir. 2000)("In Lopez, the Supreme Court struck down the 'Gun-Free School Zone Act,' 18 U.S.C. § 922(q)(1)(a), holding it exceeded Congressional power under the Commerce Clause

because the Act did not regulate a commercial activity (possession of a gun near a school) . . . .").

Nevertheless, Congress acted constitutionally when it made it a crime for a felon to possess a firearm "in or affecting commerce," 18 U.S.C. § 922(g), because doing so was "necessary and proper for carrying into execution" congressional regulation excluding felons from the interstate firearm market, U.S. Const. art. I, § 8, cl. 18. "Prohibiting the intrastate possession . . . of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." Raich, 545 U.S. at 26. Prohibiting felons from receiving or transporting firearms in or affecting commerce without criminalizing possession would "significantly impede enforcement efforts." Scarborough v. United States, 431 U.S. 563, 576 (1977)(Marshall, J.). Forbidding felons to acquire firearms without forbidding them to possess firearms would be well-nigh unenforceable, because "[t]hose who do acquire guns after their conviction obviously do so surreptitiously and . . . it is very difficult as a practical matter to prove that such possession began after the possessor's felony conviction." Scarborough v. United States, 431 U.S. at 576. That sort of enforcement difficulty explains why "[p]rohibiting the intrastate possession . . . of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." Raich, 545 U.S. at 26. Similarly, forbidding people to buy or otherwise acquire marijuana but permitting marijuana possession "would leave a gaping hole in the CSA [Controlled Substances Act, Pub. L No. 91-513, 84 Stat. 1236 (1971)]," so "Congress was acting well within its authority to 'make all laws which shall be necessary and proper' to 'regulate Commerce . . . among the several states'" when it forbad marijuana possession. Raich, 545 U.S. at 22 (quoting U.S. Const. art. I, § 8)(second alteration in the original). See id. (commenting that "the enforcement difficulties that attend distinguishing

between marijuana cultivated locally and marijuana grown elsewhere" justify Congress' decision "to regulate the intrastate manufacture and possession of marijuana . . . when it enacted comprehensive legislation to regulate the interstate market" in marijuana").

> That simple possession is a noneconomic activity is immaterial to whether it can be prohibited as a necessary part of a larger regulation. Rather, Congress's authority to enact all of these prohibitions of intrastate controlled-substance activities depends only upon whether they are appropriate means of achieving the legitimate end of eradicating Schedule I substances from interstate commerce.

Raich, 545 U.S. at 40 (Scalia, J., concurring in judgment). On the other hand, Congress, could not have prohibited felons from possessing firearms or people from possessing marijuana if it enacted those prohibitions in isolation, i.e., without tying the prohibition to a regulation of commerce that affects more states than one, because the Necessary and Proper Clause presupposes an exercise of another congressional power. See, e.g., United States v. Kebodeaux, 570 U.S. 387, 394-95      (observing that, while the Constitution "makes few explicit references to federal criminal law," the Necessary and Proper Clause "authorizes congress in the implementation of **other explicit powers**, to create federal crimes" (emphasis added)).

Determining whether Commerce Clause legislation is a regulation of commerce that affects more states than one -- as opposed to a law that is necessary and proper for carrying such a regulation into execution -- is more than an academic inquiry. When Congress exercises its naked Commerce Clause power, Congress can do whatever it likes as long as it does not violate express constitutional prohibitions. See Gibbons v. Ogden, 22 U.S. (9 Wheat) at 196 (declaring that the Commerce Clause power, "like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution"). Thus, it is constitutionally proper for Congress to exercise its Commerce Clause power with some ultimate purpose in view that Congress could not pursue directly even if

it steps on the toes of the States' traditional police power while doing so.

> The thesis of the opinion [in <u>Hammer v. Dagenhart</u>] that the motive of the prohibition or its effect to control in some measure the use or production within the states of the article thus excluded from the commerce can operate to deprive the regulation of its constitutional authority has long since ceased to have force.

<u>United States v. Darby</u>, 312 U.S. at 116. <u>Cf.</u> <u>Hammer v. Dagenhart</u>, 247 U.S. at 271-72 (invalidating a statute denying "the facilities of interstate commerce to those manufacturers in the states who employ children within the prohibited ages," because the statute "in its effect does not regulate transportation among the states, but aims to standardize the ages at which children may be employed in mining and manufacturing within the states").

When Congress clothes the Commerce Clause with Necessary and Proper Clause vestments, on the other hand, resulting legislation is subject to two additional limitations: the legislation must be both necessary and proper. Necessity does not mean "an absolute physical necessity, so strong, that one thing to which another may be termed necessary, cannot exist without that other." <u>McCulloch v. Maryland</u>, 17 U.S. at 203. Instead, necessity "frequently imports no more than that one thing is convenient, or useful, or essential to another." <u>McCulloch v. Maryland</u>, 17 U.S. at 203. In more recent years, the Supreme Court has translated <u>McCulloch v. Maryland</u>'s necessity analysis into modern vocabulary such that "a particular federal statue" is constitutionally necessary if it "constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." <u>United States v. Comstock</u>, 560 U.S. 126, 134 (2010)(Breyer, J.). <u>See</u> <u>Sabri v. United States</u>, 541 U.S. 600, 605 (2004)(Souter, J.)(referring to this necessity relationship as "means-ends rationality").[5]

---

[5]When the Supreme Court speaks precisely, it cleaves close to the Necessary and Proper Clause's text, and requires legislation to be necessary "for carrying into execution" Congress' enumerated powers, U.S. Const. art. I, § 8, cl. 18, as opposed to being necessary for achieving

the public policy goals that Congress pursues by exercising its enumerated powers, see Sebelius, 567 U.S. at 560 (opinion of Roberts, C.J.)("Each of our prior cases upholding laws under [the Necessary and Proper] Clause involved exercises of authority derivative of, and in service to, a granted power."); id. at 653 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.)("The lesson of these cases is that the Commerce Clause, even when supplemented by the Necessary and Proper Clause, is not *carte blanche* for doing whatever will help achieve the ends Congress seeks by the regulation of commerce."). For example, in Sabri v. United States, Justice Souter carefully articulates the connection between Congress' Spending Clause power, see U.S. Const. art. I, § 8, cl. 1, and a statute that makes it a federal crime to bribe state, local, or tribal officials if the state, locality, or tribe receives federal funds:

> Congress has authority under the Spending Clause to appropriate federal moneys to promote the general welfare, and it has corresponding authority under the Necessary and Proper Clause to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars. Congress does not have to sit by and accept the risk of operations thwarted by local and state improbity. Section 666(a)(2) addresses the problem at the sources of bribes, by rational means, to safeguard the integrity of the state, local, and tribal recipients of federal dollars.

Sabri v. United States, 541 U.S. at 605 (citations omitted). The Supreme Court has not, however, always been careful to restrict its analysis to Necessary and Proper Clause legislation's relationship to Congress' enumerated powers -- and not its relationship to Congress' public policy goals. As an illustration, in United States v. Kebodeaux, 570 U.S. 387 (2013), Justice Breyer quickly outlines the source of Congress' power to impose registration requirements on military sex offenders:

> [U]nder the authority granted to it by the Military Regulation and Necessary and Proper Clauses, Congress could promulgate the Uniform Code of Military Justice. It could specify that the sex offense of which Kebodeaux was convicted was a military crime under that Code. It could punish that crime through imprisonment and by placing conditions upon Kebodeaux's release. And it could make the civil registration requirement at issue here a consequence of Kebodeaux's offense and conviction.

United States v. Kebodeaux, 570 U.S. at 395 (Breyer, J.). Justice Breyer follows that analysis with a long discussion regarding how "registration requirements applied to federal sex offenders after their release can help protect the public from those federal sex offenders and alleviate public safety concerns." United States v. Kebodeaux, 570 U.S. at 395. As Chief Justice Roberts recognized, that discussion regarding "the general public safety benefits of the registration requirement" is entirely "beside the point." United States v. Kebodeaux, 570 U.S. at 399 (Roberts, C.J., concurring in judgment). In the Chief Justice's view, it was enough to say that

> [t]he Constitution gives Congress the power "[t]o make Rules for the Government

Propriety, unlike necessity, has largely escaped judicial scrutiny.  See Gary Lawson &

Patricia B. Granger, The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the

Sweeping Clause, 43 DUKE L.J. 267, 287 (1993)("The word 'proper' has generally been treated

as a constitutional nullity or, at best, as a redundancy.").  In recent years, however, the Supreme

Court has begun to take seriously the notion that laws -- no matter how necessary -- are improper

if they undermine the nation's constitutional structure.  See Printz v. United States, 521 U.S. 898

(1997)(Scalia, J.)(concluding that a law carrying the Commerce Clause into execution is not

proper, for Necessary and Proper Clause purposes, if it "violates the principles of state

---

and Regulation of the land and naval Forces."  And, under the Necessary and
Proper Clause, Congress can give those rules force by imposing consequences on
members of the military who disobey them.  A servicemember will be less likely
to violate a relevant military regulation if he knows that, having done so, he will
be required to register as a sex offender years into the future.

United States v. Kebodeaux, 570 U.S. at 400 (Roberts, C.J., concurring in judgment)(alteration
in the original)(citations omitted)(quoting U.S. Const. art. I, § 8, cl. 14).  See id., 570 U.S. at 400
("The majority says, more or less, the same thing.").  According to the Chief Justice, the public
policy "consequences of the registration requirement are irrelevant for our purposes," because

[p]ublic safety benefits are neither necessary nor sufficient to a proper exercise of
the power to regulate the military.  What matters -- all that matters -- is that
Congress could have rationally determined that "mak[ing] the civil registration
requirement at issue here a consequence of Kebodeaux's offense" would give
force to the Uniform Code of Military Justice adopted pursuant to Congress's
power to regulate the Armed Forces.

Ordinarily such surplusage might not warrant a separate writing.  Here,
however, I worry that incautious readers will think they have found in the
majority opinion something they would not find in either the Constitution or any
prior decision of ours: a federal police power.

United States v. Kebodeaux, 570 U.S. at 401-02 (Roberts, C.J., concurring in judgment)(second
alteration in the original)(citation omitted)(quoting United States v. Kebodeaux, 570 U.S. at 395
(Breyer, J.)).  Chief Justice Roberts' analysis persuades the Court that Justice Breyer's discussion
regarding public safety is a non sequitur, and not an indication that Congress can enact
legislation under the Necessary and Proper Clause just because that legislation furthers public
safety or some other worthy policy goal.

sovereignty" that various other constitutional provisions reflect); <u>Sebelius</u>, 567 U.S. at 559 (opinion of Roberts, C.J.)(declaring that "laws that undermine our structure of government established by the Constitution" are not a proper means for carrying Congress' enumerated powers into execution); <u>id.</u> 567 U.S. at 653 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.)("[T]he scope of the Necessary and Proper Clause is exceeded not only when the congressional action directly violates the sovereignty of the States but also when it violates the background principle of enumerated (and hence limited) federal power."). Laws that undermine constitutional structures do not "consist with the . . . spirit of the constitution," so Congress' Necessary and Proper Clause power does not permit it to adopt such laws. <u>McCulloch v. Maryland</u>, 17 U.S. (9 Wheat) at 421.

Applying these constitutional principles to A. Garcia's Commerce Clause arguments shows that those arguments are not sound. The problem with those arguments is that A. Garcia challenges VICAR's application to himself and not VICAR's facial constitutionality. A law that regulates commerce among the states or is necessary and proper for carrying such a regulation into execution is not susceptible to an as-applied Commerce Clause challenge, because where a "class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." <u>Perez v. United States</u>, 402 U.S. at 154 (quoting <u>Maryland v. Wirtz</u>, 392 U.S. 183, 193 (1968)). <u>See</u> <u>Taylor v. United States</u>, 136 S. Ct. 2074, 2081 (2016)(Alito, J.)("[I]t makes no difference under our cases that any actual or threatened effect on commerce in a particular case is minimal."). <u>See also</u> <u>United States v. Farnsworth</u>, 92 F.3d 1001, 1006 (10th Cir. 1996)(rejecting an as-applied Commerce Clause challenge to 18 U.S.C. § 922(g), because "the *de minimis* effect of [the defendant]'s own actions on interstate commerce does not invalidate his conviction"). Either Congress has the power -- under the Commerce Clause and

the Necessary and Proper Clause -- to pass a law, in which case the law is constitutional in all its applications, or Congress lacked that power, in which case the law is unconstitutional in all its applications. The Court thus denies A. Garcia's oral motion challenging VICAR's constitutionality as applied to this case.

In a hearing on June 14, 2018 in a related matter -- United States v. Baca, No. CR 16-1613 -- A. Garcia informed the Court that he intended to file written briefing supporting his oral motion under rule 29 of the Federal Rules of Criminal Procedure. In that briefing, A. Garcia is free to argue that the Court should reconsider its determination that an as-applied Commerce Clause challenge is a contradiction in terms. A. Garcia is also free to argue that 18 U.S.C. § 1959(a) is facially unconstitutional vis-à-vis violent crimes committed "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a).[6]

---

[6]Whether VICAR is constitutional insofar as it imposes punishment for violent crimes that are committed "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity" is not at issue in this case. 18 U.S.C. § 1959(a). If the issue were, however, the Court would conclude that the statute is constitutional in that respect. Commerce includes exchanging goods and services, so Congress regulates commerce when it forbids particular kinds of exchanges, such as performing specific service -- committing violent crimes -- "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). Prohibiting that sort of transaction would not constitute a regulation of purely intrastate commerce, because an enterprise engaged in racketeering activities must -- by definition -- engage in interstate or foreign commerce or have activities that affect interstate or foreign commerce. See 18 U.S.C. § 1959(b)(2). Consequently, that prohibition is a valid exercise of Congress' Commerce Clause power, and using a criminal law to enforce valid commercial regulations is both necessary and proper. See McCulloch v. Maryland, 17 U.S. 316 (1819)("The good sense of the public has pronounced, without hesitation, that the power of punishment appertains to sovereignty, and may be exercised, whenever the sovereign has a right to act, as incidental to his constitutional powers.").

**IT IS ORDERED** that Defendant Arturo Arnulfo Garcia's oral motion, under rule 29 of the Federal Rules of Criminal Procedure, to dismiss Count 3 of the Second Superseding Indictment, filed March 9, 2017 (Doc. 947), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 USC § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

       *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

       *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

    *Attorneys for Defendant Edward Troup*

Russel Dean Clark
Las Cruces, New Mexico

    *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

    *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

    *Attorneys for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

    *Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Eduardo Solis
El Paso, Texas

*Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver Colorado

--and--

Noel Orquiz
Deming, New Mexico

*Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

*Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

*Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

     *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and--

Ray Velarde
El Paso, Texas

     *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

*Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

*Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

*Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

*Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

*Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

      *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

      *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

      *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

      *Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

*Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

*Attorneys for Defendant Shauna Gutierrez*

Jerry A. Walz
Sam Winder
Walz and Associates
Albuquerque, New Mexico

*Attorneys for Defendant Brandy Rodriguez*